### KYNOCK *v.* WILWIN CO.

1. SALES—EVIDENCE—CUSTOMS AND USAGES—TRIAL—INSTRUCTIONS
   TO JURY.

   In an action for the price of a steam-heating plant, where
   the defense was that the plant had failed to fulfill the
   terms of the guaranty to heat the bungalow to 70 degrees
   Fahr., when the outside temperature was 30 degrees be-
   low zero, all controversy as to defendant's duty to equip
   the bungalow with storm windows should have been with-
   drawn from the jury, in the absence of any evidence of
   a custom to so equip new houses in that vicinity; there
   being no such requirement in the contract.

2. EVIDENCE—EXPERT TESTIMONY—OPINION—COMPETENCY — GUAR-
   ANTY.

   Where the defense to an action for the price of a steam-
   heating plant was that it had failed to heat the house
   to the degree guaranteed in the contract, a graduate of
   an engineering school who had had an opportunity to
   acquire extra knowledge upon the subject of heating, and
   who had had more than three years' practical experience
   in general engineering, was competent to testify that in
   his opinion the plant in question, which he had "figured,"
   from the size of the boiler and the number of feet of
   radiation, the condition the house was in—the 'number
   of feet that should be heated—that the heater and radia-
   tors were sufficient to heat the house, if properly installed,
   to the degree guaranteed, although he had never before
   installed a plant.

Error to Mackinac; Shepherd, J. Submitted Jan-
uary 21, 1919. (Docket No. 79.) Decided April 3,
1919.

Assumpsit by Charles E. Kynock and another, co-
partners as Charles Kynock & Company, against the
Wilwin Company, Limited, for goods sold and deliv-

ered.   Judgment for plaintiffs.   Defendant brings error.   Reversed.

*E. S. B. Sutton* (*M. M. Larmonth,* of counsel), for appellant.

*Prentiss M. Brown,* for appellees.

OSTRANDER, J.   A representative of plaintiffs having looked the building, a bungalow, over, and having had some conversation with a representative of defendant, the agreement the parties finally 'made is evidenced by writings here set out:

"WILWIN CO LDT,
   "Trout Lake, Mich,
      "Attn, Mr, W, J, Chesbrough
*"Gentlemen;*
   "In accordance with our conversation of the other day we submit herewith a price on the boiler and radiators necessary for steam heating your log bungalow. We will guarantee that the equipment we specify will, if installed according to our recommendations, heat your building to a temperature of 70 degrees Fahr, when the outside temperature is 30 degrees below zero.
   "The height of the boiler we recommend is, inclusive of nipples, 5'-6". Your pipes are about 18" above ground level, therefore if you can make a pit 3'-6" deep for the boiler to set in, it will work satisfactorily. The boiler is 6'-6" long x 2'-8" wide outside measurement.
   "Should we be favored with your order for boiler and radiators, we will be glad to do anything in our power to see that you secure a satisfactory plant whether we do the installing or not,
                    "Very truly yours
                       "CHARLES KYNOCK & CO,
Encl,                    "C, W, KYNOCK B, M, E,"

         "HEATING PLANT FOR WILWIN CO. LTD.,
               "TROUT LAKE, MICH.
"BOILER—
   "Ideal Sectional Steam Boiler, 19 inch, No. s-19-7, 8 hour rating 900 square feet.

"RADIATORS—

 344 square feet 2 column Rococo Radiators, 38″ high.
 80 square feet 3 column Rococo Radiators, 38″ high.
 85 square feet 20″ Rococo Window Radiators.
 45 square feet 13″ Rococo Window Radiators.

"PRICE—

For the above equipment F. O. B. Factory with 30c per 100 lbs. freight allowance, boiler to be equipped with safety valve, gauges, etc., without smoke pipe, $550.00.

"Boiler to be shipped from Buffalo, N. Y.

"Radiators to be shipped from Detroit, Mich. You will note that we have figured this outfit to heat your building to 70 deg. at an outside temperature of 30 below. The amount of equipment needed would be considerably less if this were figured as is ordinarily done at 70 deg. inside at zero outside.

"We recommend a chimney flue with an inside area of 96 square inches and height of 40 feet.

"On account of uncertainties in the metal market this price is subject to change without notice."

"WILWIN, MICHIGAN,<br>"Mackinac Co.,<br>"October 6th, 1917.

"MR. CHAS. KYNOCK,
 "St. Ignace, Michigan.

*"Dear Sir:*

"Confirming our telephone conversation of today, we will accept your price of $510.00 for a complete heating outfit for our Bungalow, as specified in your letter of the 21st of September. This outfit, it is understood, will be ample to heat the different rooms of the building satisfactorily, or to 70 degrees F., as you put it.

"Kindly get equipment here as soon as possible, and arrange to have the work done for us by your firm, in order that everything may be put in correctly.

"Yours very truly,<br>"THE WILWIN CO., LTD.,<br>"By: W. J. CHESBROUGH.<br>"(Signed)"

"ST. IGNACE, MICHIGAN,
                    "Oct. 8, 1917.
"THE WILWIN CO., LTD.,
    "Trout Lake,
        "Michigan.
"*Gentlemen:*
    "In reply to your letter of October 6th just received.
    "We are writing to make sure that no differences of opinion will exist between us as to what is included in our bid of $510.00. For this sum as per our letter of September 21st we agree to furnish you with boiler and radiators only to heat your building F. O. B. Factory with a freight allowance of 30c per 100 lbs. Any other material required in doing this work such as boiler pipe covering, smoke pipe, etc., we will be glad to furnish you at cost plus a small commission for handling. We will be glad to furnish you with a competent man to install this apparatus at $6.00 per day and expenses to, from and at the job. Also a plumber's helper at $3.50 per day and expenses if he is required.
    "We have ordered the material and will make arrangements to install the apparatus at once upon its arrival.
                    "Yours truly,
                        "CHARLES KYNOCK & CO."

Plaintiffs, furnishing the materials, proceeded to install the heating plant and turned it over to defendant. Because it did not heat the building, defendant refused to pay for it and plaintiffs brought this suit. A jury returned a verdict for plaintiffs for $902.14, and judgment was entered on the verdict. A new trial was refused, and upon the record brought into this court defendant has assigned 19 errors.

It is necessary to notice and we do notice two only of the claims of error, one because it requires a reversal of the judgment and a new trial, the other because the same or a similar situation is likely to arise upon a new trial.

Looking over the case through the medium of the testimony, it seems incredible that the jury could have

determined that the heating. plant, in performance, met the warranty. That it did not heat the house to a temperature of 70 degrees, even with weather much warmer than 30 degrees below zero, is a fact abundantly, it may be said conclusively, established by testimony. The theories according to which the cause was tried and submitted to the jury are well disclosed in the charge of the court. It is short and is set out here in full:

"We have for your consideration a case not very difficult—that is not very much involved—I have not made myself plain yet—it is not a complicated case.

"The plaintiff claims he sold to the defendant a furnace, for which he has not received his pay. The defendant admits that he contracted to purchase the furnace but claims that the furnace was not such a one as he bought. In other words, the plaintiff was to put in and install a furnace up there in the house in question that would heat the house, with ordinary care on the part of the defendant, in running the furnace, which ordinary care was not expressed in the contract, but the court instructs you, was anticipated —that they should use ordinary care of their house and in firing their furnace. And he agreed that the furnace would heat the rooms in that house to a temperature of 70 degrees when the thermometer was 30 degrees below zero outside.

"He is claiming he put in such a furnace. The defendant claims he has not.

"If he has put in such a furnace, he is entitled to recover at your hands a verdict of $902.14. If he has not put in such a furnace he is not entitled to recover anything, and the furnace still belongs to him, and not to the defendant.

"In this connection lest I forget to state it later, the burden of proof is upon the plaintiff. The plaintiff must have proved his case by preponderance of the testimony—by testimony that is more convincing than that produced by the defendant, or he is not entitled to recover. On the contrary, if he has proved his case by a preponderance of the testimony, he is entitled to recover.

"Now the plaintiff went up there and looked at the house, and saw what kind of a proposition there was before him. He is bound by the conditions as he found them. And in that connection I charge you, that when he saw those pipes there—and it was his duty to see them if he did not—that if he was not satisfied with those pipes, that it was his duty to make his contract with reference to them, and tell the defendant that different pipes must be used. I mean the pipes that were already installed in the house. They were a part of the house to be used for heating by a furnace there, and he is presumed to have contracted by the conditions of the house as he found it. That eliminates that pipe proposition.

"The defendants say that after the furnace was installed, that though they used their utmost endeavor in firing it—and used different kinds of fuel—and not only used the heat from the furnace, but the heat from the fireplace—that still the heat so far from being 70 degrees temperature in the large room was uncomfortable and impossible to live in, and they were obliged to move out. If that is the case and that was not their fault, then it was not such a furnace as they bought, and not such a furnace as they were bound to pay for.

"The plaintiff claims that this was due to the fact that the boiler was installed at a greater distance from the house, than was contemplated when the contract was made—than was planned for by the plaintiff. Now if moving that boiler that distance away, was the cause of not heating the house to the degree contracted for, then the plaintiff is entitled to recover for the boiler—for the furnace—if the furnace would have heated the house 70 degrees temperature inside, with a temperature of 30 degrees blow zero outside, if the boiler had been put where it was contracted.

"The defendant in answer to that says that the putting of the boiler outside would make but slight difference any way. And further he says even with the boiler outside, the boiler heated the radiators as hot as was required—as hot as steam would make them and that therefore it would make no difference then. The province of the boiler is to heat the radiators, and if the boiler heated the radiators as hot as steam could make

them, it don't make any difference whether the boiler was away six feet, or six hundred feet, or six miles, so far as the placing of the boiler far off is concerned. It didn't make any difference they claim; and if it didn't make any difference, then the plaintiff could not complain if the defendants have made some change in the conditions of the contract, so long as the change exerts no material difference—it will not void the contract on either side.

"It is the claim of the plaintiffs also that ordinary prudence required of the defendants that they should have placed storm windows on the house. If placing storm windows on the house, together with the boiler in the place where it was located in the first place, would have rendered the furnace, such a furnace as they agreed to furnish, then he would be entitled to recover.

"You understand, do you not, that the plaintiff was entitled to recover if the furnace, if put in according to contract, would have done the work. If it would have not done the work, even if the storm windows had been on the house and the boiler had been put 6 feet from the radiator, as contemplated, still if it would have not done the work, then the plaintiff is not entitled to recover. If it would have done the work, he would be entitled to recover."

The bungalow was a new building. In its outside walls a large amount of glass was used in windows and doors. It does not appear that there was any fault found, or to be found, with the glazing of windows or doors or that the construction was in any respect faulty, so far as like construction can be made effective in excluding air and cold. After plaintiffs had rested their case, upon the cross-examination of Mr. Will Chesbrough, the first witness for defendant and a representative of defendant, he was asked: "Did you put storm windows on your building?" and answered, "No, sir." Objection being made by counsel for defendant, this colloquy followed:

"*Mr. Brown:* I think it is admissible if we can later

show that it is customary and usual. Any man who lives up here in this country knows that it is a customary practice to put storm windows and doors on a building in this community.

"*Mr. Larmonth:* We are working under a specific contract. It makes no difference what the usual custom was.

"*The Court:* Of course he is bound to use ordinary prudence and ordinary care in maintaining the building and keeping up fires.

"*Mr. Larmonth:* Suppose he had built a building that was not lathed and plastered, as many people do, and this man went in there and took a contract to heat it, and should come in there afterwards and say 'You ought to have lathed and plastered it.'

"*The Court:* If he had the lath on, he would have been expected to finish it.

"*Mr. Larmonth:* Surely; and if he had the frames for storm windows, he would be expected to put glass in.

"*The Court:* Well, it is out of order. I think it would be necessary to prove custom first. We will reserve that until that is done.

"*Q.* Did you at any time tell the American Radiator Company that you had storm windows?

"*A.* No, sir.

"*Mr. Brown:* I offer in evidence exhibit 7.

"*Mr. Larmonth:* We would object to it as irrelevant and immaterial and not a communication between the parties to the suit, but is a request to an outside concern, and no showing that the plaintiff saw it or relied upon it in making his contract.

"*Mr. Brown:* It is offered for rebutting the present testimony of the defendant.

"*Mr. Larmonth:* If you are offering it for just the one purpose, we shall object to it for that.

"*Mr. Brown:* For what reason?

"*Mr. Larmonth:* Immaterial.

"*The Court:* The witness may not be impeached on immaterial matters.

"While the admission is not contractural, I think it is admissible, because if he had storm windows it was his duty to put them on.

"*Mr. Larmonth:* Note an exception.

"*Mr. Larmonth:* I object to his reading anything to the jury except that part directly—

"*Mr. Brown* (interrupting): That is all I am going to read. Referring to his house and the storm windows. 'Yes' is the answer of Mr. Chesbrough.

"*Q.* Was that answer true, Mr. Chesbrough, or not?

"*A.* No, sir.

"*Q.* It was not true. Why did you so state it to the American Radiator Company?

"*A.* When I figured that out that way, that was a part of their questions, and I put that down because I assumed eventually we would have them.

"*Q.* That was not true at that time?

"*A.* No, sir."

Upon cross-examination of another witness for defendant, he was asked:

"*Q.* Would you say that it would be ordinary prudence and care to put storm windows on such a dwelling as this?"

There was objection and the following:

"*Mr. Brown:* It goes to the precise question that the court has ruled on; that I can show what the ordinary custom or rule would be.

"*The Court:* I think I will allow that.

"*Q.* What would you say, Mr. McGuire?

"(Question read to witness.)

"*A.* Yes, sir, it would.

"*Q.* It would be?

"*A.* Yes, sir."

In view of this testimony, the witness on redirect examination testified as follows:

"*Q.* Would that become necessary as the building grew older than it would be at the present time?

"*A.* It would; it would be absolutely necessary afterward.

"*Q.* But now everything closes tight?

"*A.* The building at the present time is as tight as a bottle but it will open up as soon as it gets enough heat in that building to shrink the lumber."

During the argument to the jury by the attorney for plaintiffs, there occurred the following:

"There was no testimony on the part of the defendant that this house would not have been sufficiently heated if equipped with storm windows.

"*Mr. Larmonth:* I take an exception. Mr. McGuire testified that even with storm windows the plant would not have been large enough to heat the house. I wish to take an exception to the statement of counsel that there was no proof offered that this plant would not have been sufficient if there had been storm windows on it. Mr. McGuire positively testified that it would not have heated the room even with storm windows on.

"*Mr. Brown:* I have stated it just exactly as the evidence was.

"*The Court:* I think the testimony was contradicted by inference. I do not pretend to remember all the evidence; but the testimony of the two plumbers who stated that the radiation should have been nearly double what it was—that contradicted."

The charge of the court upon this point is above set out.

The testimony referred to and the charge of the court upon the subject of storm windows may account for the verdict which was returned. No custom of the country was proved or attempted to be proved, no testimony tends to prove that there were storm windows in position or constructed, and no claim is made that plaintiffs before making the contract in question here or before installing the plant knew anything about the letter, or communication, sent by defendant to the American Radiator Company, brought to the attention of the jury by plaintiffs. Mr. Charles Kynock testified for plaintiffs:

"There is a great deal of glass surface in the house, and I took that into consideration in figuring the amount of radiation I would have to put in the house."
*  *  *

He, the principal witness for plaintiffs, the man

who professed ability to determine the capacity of the heating plant required, does not intimate that he understood, or believed, that storm windows were to be placed on the house. The contract, made after an inspection of the premises by plaintiffs' agent, is silent upon the subject of storm windows. We assume that it is not possible to show that all dwellings in the locality are equipped with storm windows. It appears, therefore, that whether it would have been *prudent* for defendant to install such equipment is wholly immaterial to the issue.

Under some misapprehensions, we think, of what the language of the charge was, the court, in denying the motion for a new trial, said upon this subject:

"Many of the allegations of error in the storm window controversy are based on the assumption that the court held that evidence of an agreement as to storm windows prior to the execution of the written contract was admissible. The court admitted no such testimony, but on the contrary ruled it out. It was held that it was the duty of the defendant to use ordinary care and prudence and testimony as to what proper or rather ordinary care was, was admitted."

But *prudence* on the part of defendant, or ordinary care, in this connection meant but one thing. The advice which was given to the jury had the effect to put plaintiffs in the position they would have occupied if the contract had called for storm windows and defendant had neglected to use them. The whole subject should have been withdrawn from the consideration of the jury.

Defendant complains because the court refused to strike out certain testimony of the witness Kynock called by counsel expert testimony. The witness, as has been stated, inspected the premises and made the necessary estimates for the steam plant which was installed. He had never before installed a steam heating

plant, but he testified that he was a graduate of the engineering school in the University of Michigan, had three years' practical experience near St. Louis, Missouri, in general engineering, and some further experience during the last preceding three years at St. Ignace, Michigan; that he had studied under heating experts and a part of his university course was "in the heating and ventilating line." He testified further that:

"From the size of the boiler and the number of feet of radiation, the condition the Wilwin house was in—that is the number of feet that should be heated, I would say that the heater and radiators were sufficient to heat that house, if properly installed, to 70 degrees inside when it is 30 degrees below zero outside."

This is the only opinion he expressed upon direct examination. On cross-examination he restated his education, or means of education, and his experience, when the motion to strike out was made, refused and exception taken. He was then cross-examined at length and his estimates and method shown to the jury. Counsel say in the brief:

"Therefore, we find a theorist and not a practical person, *with any experience,* posing before this jury as an 'expert' as to steam heating. He knew no more than the jury about the matter, yet he was permitted to tell how this plant should be installed. How much radiation. How much boiler capacity. Where the radiators should be set, and how many, etc.; when as a matter of fact he knew from experience nothing whatever about the subject. It was all a theory and an experiment with him."

In considering the ruling complained about, it must be kept in mind that the contract had been made upon the estimates or advice of the witness. His statement that in his opinion a sufficient plant had been provided for in the contract was but a re-affirmation of what

the contract implies. He had "figured" the plant. He possessed, at least had had opportunity to acquire, extra knowledge upon the subject of heating. He had had some experience in dealing with heating problems and although he had never before installed a steam heating plant we cannot think it was error to refuse to strike out his opinion, expressed in the words above set out. Beyond that, plaintiffs' counsel did not take him. It was defendant's counsel who conducted him into the realm of expert testimony.

The judgment is reversed, with costs to appellant, and a new trial granted.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.